## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TERESA LEE COOPER,

     *Plaintiff*,

*v.*                       CASE NO. 4:13-cv-11883

COMMISSIONER OF         DISTRICT JUDGE TERRENCE G. BERG
SOCIAL SECURITY,         MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

This case was referred to this magistrate judge under 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, for the purpose of reviewing the Commissioner's

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Doc. 8 at 1; Doc. 9 at 1.)

Plaintiff Teresa Lee Cooper was thirty-five years old at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 32.) Plaintiff worked at a Chrysler automobile dealership from 1996 until 1997, at Dualex Incorporated from 1997 until 2000, and at Ford Motor Company as an automobile assembler from 2000 until 2009.[2] (Tr. at 134, 150, 188.) Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34, on May 7, 2010, alleging that she became unable to work on August 10, 2009. (Tr. at 123.) The claim was denied at the initial administrative stage. (Tr. at 57.) In denying Plaintiff's claims, the Commissioner considered fibromyalgia and obesity and other hyperalimentation as possible bases for disability. (*Id.*) On January 4, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") John J. Rabaut, who considered the application for benefits de novo. (Tr. at 29-56.) In a decision dated February 10, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 24.) Plaintiff requested a review of this decision on February 24, 2012. (Tr. at 7-8.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on February 25, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On April 26, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

---

[2] Plaintiff testified that she last worked in August, 2009, (Tr. at 34), and that the income in her earnings record in 2010 and 2011, (Tr. at 125-40), came from benefits paid through Ford by UniCare. (Tr. at 34-35.) The Administrative Law Judge noted these earnings and found that the claimant did not engage in substantial gainful activity after the alleged onset date. (Tr. at 14.)

2

## B.     Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105. The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind

4

might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II

benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2015, and that she had not engaged in substantial gainful activity since August 10, 2009, the alleged onset date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine, carpal tunnel syndrome, fibromyalgia, temporomandibular joint disorder ("TMJ"), generalized anxiety disorder, depressive disorder, and obesity were "severe impairment[s]" under 20 C.F.R. § 404.1520. (Tr. at 14-15.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 15-17.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 22-

23.) The ALJ also found that Plaintiff was thirty-two years old on the alleged disability onset date, which put her in the "younger individual age 18-49" category under 20 C.F.R. § 404.1563. (Tr. at 23.) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 17-22.) Therefore, the ALJ held that Plaintiff was not disabled. (Tr. at 12, 24.)

### E.     Administrative Record

The medical evidence contained in the Administrative Record indicates that Plaintiff saw a chiropractor on several occasions from 2004 until 2010, but the notes from those sessions do not provide diagnoses or other relevant information. (Tr. at 208-15.) Plaintiff went to the emergency room on December 26, 2007, complaining of pelvic pain. (Tr. at 204-07.) Transvaginal imaging revealed a gestational sac but no fetal pole. (Tr. at 204.) The staff radiologist, Dr. Kenneth Tarr, reported that the imaging provided "[v]ery poor detail," but he noted a possible "cystic area in the right ovary" and diagnosed a spontaneous abortion and retained products. (Tr. at 207.)

Plaintiff next saw Dr. Seema Doshi regarding her irregular menstrual cycle and general anxiety. (Tr. at 227.) She informed Dr. Doshi that her abdomen cramped, though she denied severe pains or signs of pregnancy. (*Id.*) The examination revealed only "mild to mod[erate] tenderness in the lower abdomen mainly in the center." (*Id.*) Dr. Doshi diagnosed dysfunctional uterine bleeding and prescribed an oral contraceptive. (Tr. at 227-28.) The anxiety was possibly related to Plaintiff's impending marriage, and Plaintiff "wonder[ed] if they [sic] can get something to help with the stress and anxiety." (*Id.*) Though Dr. Doshi observed that Plaintiff was not anxious, agitated, or depressed on the treatment date, she assessed anxiety and prescribed Xanax. (*Id.*) Plaintiff listed her medications, including Glucophage and Zoloft, and admitted that she used or

8

had used caffeine and marijuana, and that she smoked half of a pack of cigarettes per day. (Tr. at 227.)

Plaintiff returned to Dr. Doshi on November 12, 2009 for an assessment of her back pain and headaches. (Tr. at 225.) She denied feeling chest pain, calf pain, or abdominal pain. (*Id.*) Specifically, Plaintiff complained of lower back pain, increasing during movement, that radiated down through the left leg to her foot. (*Id.*) She reported mild tingling and numbness relating to the back pain. (*Id.*) Dr. Doshi observed "[s]ome spasm[ing]" and noted that Plaintiff's lower back was tender to the touch and her buttocks were tender on deep palpation. (*Id.*) While the range of motion was "somewhat limited" and the straight-leg raise was positive, Dr. Doshi did not find vertebral tenderness or sensory, motor, or vascular deficit in the legs. (*Id.*) She diagnosed left-leg sciatica, chronic back pain, and lumbosacral spine radiculopathy. (Tr. at 226.) Plaintiff also mentioned that she periodically experienced severe headaches with some nausea. (Tr. at 225.) Dr. Doshi recommended migraine medication, pain medication, muscle relaxants, anti-inflammatory medication, back exercises, and physical therapy. (Tr. at 226.) The medications included Naprosyn, Flexeril, and Prednisone. (*Id.*) Dr. Doshi also planned to obtain an MRI report. (*Id.*)

Plaintiff received an independent medical evaluation from Dr. Nick Reina on November 20, 2009, apparently at the request of UniCare, which provided health insurance to Ford employees. (Tr. at 257.) Plaintiff now reported that "[w]ith regard to returning [to] work, [she] describes that she is sore all over. When questioned if there are areas that she is not sore, she was unable to think of any." (*Id.*) The examination found that her back had full range of motion, her strength was normal, she could stand on toes and heels, her sensation was intact but depressed in left hand, and her legs had deficient reflex. (Tr. at 258.) From this, Dr. Reina concluded that Plaintiff could not

work at that time, but should seek a reevaluation if she did not begin working within four weeks. (*Id.*)

On December 9, 2009, Plaintiff saw Dr. Doshi for her ear pain and "generalized pain all over the body." (Tr. at 223.) The ear pain was on only one side, and though it increased with mastication and other jaw movements, the temporomandibular joints and muscles ("TMJ") were not swollen or red. (*Id.*) Plaintiff reported clicking in the jaw, which was not substantiated upon examination. (*Id.*) Dr. Doshi noted that the pain could come from clinching the teeth and grinding them during sleep. (*Id.*) She prescribed Elavil and recommended over-the-counter NSAIDS to treat the TMJ dysfunction and referred Plaintiff to Dr. Susan Van Dellen to examine her regarding possible fibromyalgia. (Tr. at 224.)

Plaintiff's first appointment with Dr. Van Dellen occurred on December 17, 2009. (Tr. at 218.) Plaintiff again reported generalized pain, and this time added that the pain began one year prior and had increased in the last three months. (*Id.*) According to Plaintiff, the back pain began after a fall in her basement. (*Id.*) She complained of headaches and also asserted that she was diagnosed with irritable bowel syndrome. (*Id.*) Dr. Van Dellen did not note any abnormalities, concluding that Plaintiff had normal gait, "[g]ood range of motion" in her shoulders and neck, "[g]ood posterior tibial and radial pulses," and "[g]ood flexion of the lumbar spine." (Tr. at 219.) There was "no clinical evidence of inflammatory joint disease." (Tr. at 220.) She found tender points on the "occipital area, lower cervical, second costochondral junction, trapezius, supraspinatus, gluteal, greater trochanter, lateral epicondyle, and medial aspect of the knees." (Tr. at 219.) She also diagnosed morbid obesity and noted an MRI from October, 2009 showing mild degenerative disc disease and mild posterior disc bulge, and an ultrasound from April, 2009

10

suggesting fatty infiltration of the liver and gallbladder. (*Id.*) She diagnosed fibromyalgia, irritable bowel syndrome, and sleep disturbances. (Tr. at 220.) She provided Plaintiff with "[e]ducation and counseling," a prescription for Neurontin, and suggested Plaintiff begin exercising regularly. (*Id.*)

Plaintiff visited her dentist on March 17, 2010. (Tr. at 231.) The dentist recommended treating her sore TMJ with a bite guard and paraffin wax. (*Id.*) The dentist also screened for cancer, performed a comprehensive examination, and discussed brushing her teeth. (*Id.*) Plaintiff called the dentist's office on April 6, 2010, saying she "was doing fine." (*Id.*)

Plaintiff consulted again with Dr. Doshi on April 7, 2010. (Tr. at 221.) She reiterated her chronic generalized pain, noted her fibromyalgia diagnosis, and claimed that "she can not work so she wants disability." (*Id.*) Dr. Doshi told her that "without documented proof [Dr. Doshi] would not be able to support the disability" diagnosis. (*Id.*) The notes state that there was no chest pain, abdominal pain or tenderness, or any other abnormalities. (Tr. at 222.) Plaintiff continued to report smoking half of a pack of cigarettes per day. (Tr. at 221.) Dr. Doshi's plan was to have Plaintiff obtain a second opinion. (Tr. at 222.)

Plaintiff saw Dr. Curtis Craig on May 11, 2010 regarding fibromyalgia. (Tr. at 238.) She reported her fibromyalgia diagnosis from Dr. Van Dellen and also complained of fatigue and joint pain in her hands and knees. (*Id.*) The x-rays of the hands and knees failed to show any problems, and Dr. Craig concluded that her neck was supple, her energy level was "[g]ood" but "somewhat reduced," and the "[m]edical exam is stable." (*Id.*) He found trigger points on her neck, and noted that irritable bowel syndrome, TMJ, and carpal tunnel syndrom were all consistent co-morbidities with fibromyalgia. (*Id.*) He planned to have a lab profile and rheumatological panel completed and he prescribed Savella. (*Id.*)

Dr. Craig received laboratory results two days later, on May 13, 2010. (Tr. at 242-44.) Plaintiff had a few high readings the doctors flagged, but otherwise the results were normal. (*Id.*) She next visited Dr. Craig on June 3, 2010 for a refill of Motrin for pain and, while there, received a prescription for Cymbalta. (Tr. at 237.) The notes indicate that Plaintiff planned to "stay on disability from Romeo Ford [her employer] for right now" because she had a high level of pain. (*Id.*)

On June 15, 2010, Dr. Craig filled out a disability form for Ford on Plaintiff's behalf. (Tr. at 270-71.) It was the first in a series of forms and letters that Dr. Craig would complete for Plaintiff over the next few months. (Tr. at 259-71.) These forms did not correspond to specific consultations with Plaintiff. (Tr. at 261, 264, 267, 270.) The June 15 form indicated her primary disability was fibromyalgia and obesity was a co-morbidity. (Tr. at 270.) Dr. Craig listed June 3, 2010 as the disability start date, July 4, 2010 as the disability end date, and July 5, 2010 as the first day she could return to work. (*Id.*) The next form was dated July 4, 2010, and now included secondary disabling diagnoses of asthma, bronchospasms, and shortness of breath. (Tr. at 267.) The end of disability and first day of work dates were extended to August 1, 2010 and August 2, 2010 respectively. (*Id.*)

The next form came on August 3, 2010, and mirrored the last one except the end and work dates were now pushed back until September 2 and September 3. (Tr. at 264.) An August 12, 2010 unaddressed letter from Dr. Craig articulated his diagnosis, noting that he "tried to follow the ACR criteria of having trigger points at least eleven of them [sic] scattered" over the body. (Tr. at 260.) At the end of August, Dr. Craig filled out another form pushing the end and work dates back until October 2, 2010 and October 3, 2010 respectively. (Tr. at 261.) Finally, on September 23, 2010,

he drafted another unaddressed letter listing the work requirements of Plaintiff's past job and concluding that she was totally disabled from any job. (Tr. at 259.) He referred to Plaintiff as a "new patient." (*Id.*)

During the period when Dr. Craig was sending out this information, he treated Plaintiff on three occasions. (Tr. at 234, 235, 236.) On June 29, Dr. Craig diagnosed bronchospasms resulting, in part, from Plaintiff's exposure to bleach and her history of mild asthma. (Tr. at 236.) He gave her a Pro-Air inhaler and wrote that she would undergo pulmonary function tests. (*Id.*) Plaintiff returned to Dr. Craig on July 30 to report her persisting fibromyalgia symptoms, TMJ, and irritable bowel syndrome. (Tr. at 235.) The medical exam was "stable." (*Id.*) Dr. Craig added Lyrica to her roster of medications and noted the possibility of a rheumatology evaluation if the symptoms continued. (*Id.*) Finally, on August 12, Dr. Craig determined that Plaintiff needed splints for her hands to help with carpal tunnel syndrom. (Tr. at 234.) She mentioned receiving cortisone shots for her hands in the past, but Dr. Craig wanted to "hold off" on a cortisone injection and instead ordered x-rays. (*Id.*) The x-ray showed normal hands and wrists. (Tr. at 239.) Her depression had lifted after taking Cymbalta. (Tr. at 234.)

Plaintiff next received a consultative mental status examination from Dr. Michelle Rousseau on September 23, 2010. (Tr. at 245-51.) The majority of Dr. Rousseau's report enumerated Plaintiff's subjective complaints. (Tr. at 245-49.) Plaintiff reported all of her previous diagnoses and stated their frequency: her TMJ pain was constant; her migraines occurred at least twice per week; her panic attacks decreased from multiple times per day to "a couple per week"; and she had periodic stomach pain. (Tr. 246-47.) Additional symptoms and diagnoses included lesions on her neck, "brain fog," and an ulcer. (Tr. at 245-47.) Improvements in pain levels came from

chiropractic care (back pain),[3] Lyrica and Cymbalta (fibromyalgia), Excedrin and Maxalt (migraines), and Zoloft and Xanax (panic attacks). (*Id.*) Overall, Plaintiff "characterized her medications as working 'Fair.'" (Tr. at 247.)

Plaintiff also told Dr. Rouasseau that her daily activities included housekeeping (except for vacuuming and dusting), cooking, personal care, running errands, paying bills, driving, stretching for forty minutes per day, walking outside, caring for her three animals, reading, using the computer, playing video games, watching television, and communicating with friends. (Tr. at 247-48.) She said her past interests, such as shopping and vacationing, "aren't so easy anymore," and her current interests were sleep, family visits, and television. (Tr. at 248.) She admitted that she had interpersonal problems at her former job. (*Id.*)

Dr. Rousseau observed that Plaintiff had satisfactory communication skills and confidence in her abilities. (Tr. at 249.) The mental status examination indicated intellectual functioning within the low-average to average range and mildly impaired concentration skills. (Tr. at 250-51.) Dr. Rossoueau concluded that Plaintiff "appears able to attend, comprehend, and follow basic instructions fairly well, and she is likely able to perform a variety of activities and respond appropriately to changes in a work setting." (Tr. at 251.)

Plaintiff then saw Dr. Kanwaldeep S. Sidhu on January 3, 2011. (Tr. at 274.) Dr. Sidhu reported the visit to Dr. Craig, listing Plaintiff's complaints and portions of her medical history. (*Id.*) During the physical examination, Plaintiff walked on her toes and heels and displayed limited forward flexibility, eighty percent of the normal range of motion for her cervical spine, neurologically intact upper and lower extremities, and no indications of hyperreflexia, clonus,

---

[3] The record contains an undated letter from her longtime chiropractor, Todd Grubb, stating that she was disabled. (Tr. at 323.)

myelopathic signs, atrophy, or motor loss. (Tr. at 275.) He reviewed her cervical and lumbar x-rays, which showed "mild disc height loss at L5-S1," and sent her for a MRI of those areas. (*Id.*)

Dr. Sidhu notified Dr. Craig of the radiologist's written report of the MRI on February 2, 2011. (Tr. at 276.) Plaintiff's cervical spine had "facet arthropathy with foraminal stenosis which is mild at C4-5, mild DJD at C5-6 with broad-based disc osteophyte complex and minor disc desiccation at C6-7." (*Id.*) The lumbar report mentioned degenerative changes, minor bulging, and a small foraminal protrusion, but no severe stenosis or large herniated discs. (*Id.*) Surgery would not be prudent due to her high body mass index, Dr. Sidhu stated, and instead she should lose weight and begin physical therapy.[4] (*Id.*) He also noted that Plaintiff asked about disability, to which he responded that "in my opinion at age 34 the only thing I can offer her is to give her an off-work note for a month while she is doing therapy." (Tr. at 277.) He could not comment on whether fibromyalgia qualified her for disability. (*Id.*) The next month he considered the possibility of anterior cervical discectomy and fusion ("ACDF") at C4-5 with allograft and plating. (Tr. at 278.)

Dr. Sidhu reviewed the actual MRI film on March 14, 2011. (Tr. at 273.) He found a "black disc L5-S1 with a right-sided bulge and an annular tear but no large herniation or stenosis. Cervical MRI shows C5-6 disc herniation." (*Id.*) Plaintiff informed him that she had two weeks of physical therapy remaining and Dr. Sidhu decided to see if the therapy improved her neck complaints before moving forward with an ACDF C5-6 procedure. (*Id.*)

Plaintiff underwent a vocational rehabilitation analysis conducted by James Fuller on June 8, 2011. (Tr. at 281-84.) Mr. Fuller reviewed Plaintiff's subjective descriptions and various

---

[4] A physical therapy report from March 10, 2011 lists undefined numerical flexibility and muscle performance levels and goals. (Tr. at 280.)

medical reports. (*Id.*) Plaintiff reiterated her previous complaints and now added that she had an unsteady gait, had migraines three to five times per week with accompanying regurgitation, could not bend over without pain, had trouble understanding television programs, and had limited manipulative ability with her hands. (Tr. at 281-83.) Mr. Fuller determined that the medical reports validated Plaintiff's assertion that she could not work. (Tr. at 282.) He referenced a functional capacity report from Dr. Craig stating "she cannot work in combination [sic] sitting, standing and walking for an 8 hour day, can never lift and carry 10 pounds in a competitive work situation," would likely miss two days of work per month, and be "off task" twenty-five percent of the time. (*Id.*) From this, Mr. Fuller concluded that Plaintiff was unemployable. (Tr. at 284.) The capacity report from Dr. Craig is not in the Record.

On June 13, 2011, Dr. Isaac Turner wrote to Plaintiff's counsel, John J. Grech, that he was "following your client who is seeking disability." (Tr. at 285.) He performed a physical examination showing Plaintiff was neurologically "intact" and had "no weakness or limitations." (*Id.*) She again stated that she could not work and desired disability, but Dr. Turner "explained to her that there are treatments available for chronic headaches and fibromyalgia" and said his "goal [was] to get her back to working full time." (*Id.*)

Plaintiff met with Dr. Irene Metro, a rheumatology specialist, periodically in September and October of 2011. (Tr. at 286-309.) In a statement she wrote on October 4, Dr. Metro marked September 19, 2011 as the beginning treatment date. (Tr. at 286.) On that visit, Plaintiff repeated her medical issues to Dr. Metro and her attempts to obtain disability benefits. (Tr. at 309.) The remaining notes are difficult to decipher, but it is clear that Dr. Metro saw Plaintiff on September 29 and October 4. (Tr. at 296-98.) Plaintiff received four injections in trigger points on her trapezii

on the September 29 appointment, (Tr. at 298.), and six injections in those spots on the following visit. (Tr. at 296.) The notes from these appointments restate many of the issues listed above, and also include Dr. Metro's dietary and exercise advice. (Tr. at 293-95, 299-309.) Plaintiff reported fatigue, (Tr. at 295, 301.), significant pain, (*Id.*), and loss of balance, (Tr. at 299.) Dr. Metro performed a trigger point test, finding sixteen out of eighteen points were tender. (Tr. at 302.) Plaintiff also sought treatment for fertility issues because she planned to have a child. (Tr. at 293, 305, 307.)

Dr. Metro completed a "Fibromyalgia Source Statement" on October 4, 2011. (Tr. at 286-89.) The list of diagnosed impairments expected to last one year or more included, among others, insomnia, depression, obsessive-compulsive disorder, "hypothyroid," dizziness, irritable bowl syndrome, migraines, and polycystic ovary syndrome. (Tr. at 286.) The functional assessment estimated that Plaintiff could do the following: walk one-half of a block without rest or severe pain; sit for thirty minutes at a time; stand for twenty minutes at a time; stand or walk for less than two hours in an eight-hour workday; sit for two hours in an eight-hour workday; occasionally lift ten pounds or less; rarely lift twenty pounds; never lift fifty pounds; rarely twist, stoop, and climb stairs; never crouch or climb ladders; occasionally look down, to the right, and to the left; rarely look up; and use her hands and arms only twenty percent of the time in an eight-hour workday. (Tr. at 287-89.) The Plaintiff would need the stand-sit-walk at will option, need to walk for ten minutes every one-half hour, require a cane or assistive device, take fifteen minute unscheduled breaks every forty-five minutes, sit with her legs at hip level for half of an eight-hour workday, and be "off task" twenty-five percent of a workday. (*Id.*) Moreover, the Plaintiff was incapable of even low stress work. (Tr. at 289.)

The Plaintiff filled out a similar form on October 10, 2011. (Tr. at 290-92.) She stated that her symptoms resulted in severe pain, fatigue, sleep disturbance, cognitive difficulties, and functionality impairments. (Tr. at 291.) The symptoms had remained constant, and rest, massage, and trigger point injections alleviated some of the pain. (*Id.*) She also reported "[g]reat difficulty with work." (Tr. at 292.)

The final entry in the Record came from a consultation with Todd Lipphardt, a physician's assistant, on October 14, 2011. (Tr. at 319-22.) Mr. Lipphardt described Plaintiff as a new patient and noted that she experienced only "slight improvement" from her various treatments. (Tr. at 319.) She described her pain as five or six out of ten on a visual analog scale with medication and eight or nine out of ten without it. (*Id.*) Mr. Lipphardt reported no loss of balance, confusion, headaches, changes in bowel movements, chest or abdominal pain, shortness of breath, or numbness. (Tr. at 320.) The examination uncovered neck spasms, restricted neck movement, and sensitivity to touch on the neck. (*Id.*) Her gait, posture, and strength were normal (Tr. at 320-21.) Surgical options were provided to Plaintiff, and Dr. Richard Easton signed Mr. Lipphardt's report. (Tr. at 322.)

At the administrative hearing, Plaintiff testified about her daily activities. (Tr. at 34, 40-42.) She talked about her two dogs and noted that she handled her personal care except on her "worst flare-up days," drives short distances, tries to do housework, prepares simple meals, watches television, reads, walks around her pond, and uses her computer. (*Id.*) Her descriptions of symptoms coincided with her statements to doctors. (Tr. at 36, 37, 38, 42, 44, 45.) The pain level with medication was between six or seven out of ten on a visual analog scale, but much higher without it. (Tr. at 38-39.) She also described periods of fatigue and mental fugue. (Tr. at 39, 46.)

Spells of depression put her in a "blah mood" where she would reminisce on past activities she enjoyed but could no longer do. (Tr. at 44.)

She also provided estimates of her functional capabilities. Twenty to thirty minutes was the longest she could sit without readjusting and she needed to sit after ten to fifteen minutes of standing. (Tr. at 42.) Twenty minutes of standing caused intense neck and back pain. (Tr. at 45.) Walking required breaks every fifteen yards and she took frequent breaks during household chores. (Tr. at 40, 42) She concluded that she missed working at Ford and would still be there if she could manage the pain. (Tr. at 46.)

The ALJ asked the vocational expert ("VE") at the hearing to consider an individual with Plaintiff's background who

> could perform work at the sedentary exertional; could not climb ladders, ropes, or scaffolds; could only occasionally climb ramps or stairs; only occasional balance, stoop, crouch, and kneel [sic]; no crawling; only occasional overhead reaching and handling; no constant fingering, so frequent [sic]. The individual is going to need to avoid concentrated exposure to excessive vibration; avoid concentrated use of moving machinery; avoid all exposure to unprotected heights; and only one who works [sic] simple, routine, and repetitive tasks performed in a work environment free of fast-paced production; involving only simple work-related decisions with few, if any, workplace changes, and occasional interaction with the general public.

(Tr. at 48-49.) The VE responded that the hypothetical person could not perform Plaintiff's past work, which was classified as unskilled, medium work. (*Id.*) The VE described other jobs within the regional economy that met the ALJ's conditions, including: sedentary, unskilled work as a document addresser (500), inspector (1,000), and bench assembler (500). (Tr. at 50.) The ALJ then modified his hypothetical by adding a requirement that the individual would miss more than two unscheduled days or partial days of work per month. (*Id.*) The VE stated these conditions would preclude all competitive employment. (Tr. at 51.)

19

Plaintiff's representative, Mr. Grech, then proposed a hypothetical to the VE that kept the ALJ's original conditions and added requirements that the individual do only occasional fingering and had a sit-stand option at will. (Tr. at 51-52.) The VE replied that this would rule out any work. (Tr. at 52.) The VE also agreed with Mr. Grech that the "more sedentary [jobs] become, the more fingering becomes important." (Tr. at 53.) The ALJ then asked whether jobs would remain if he added a sit/stand option to his original hypothetical. (*Id.*) This ruled out work as a document addresser but not as an inspector or assembler. (*Id.*) Those two positions also remained viable if the individual had alternating periods of sitting for one hour and standing for ten minutes. (Tr. at 54.) The document addresser job "would not always be available" with this alternating sit and stand restriction.[5] (*Id.*)

### F.     Analysis and Conclusions

### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 17.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

---

[5] Before concluding, it should be noted that both parties make errors describing the Record in their briefs. Defendant states Exhibit 11F consists of a one-page letter, (Doc. 9 at 11), when it actually contains all of the medical records from Dr. Craig. (Tr. at 259-72.) However, Defendant does not disregard the other records, (Doc. 9 at 12), and the mistake is minor. Plaintiff incorrectly asserts that she saw Dr. Metro "at least four separate times for examinations." (Doc. 10 at 10.) The Record shows only three visits, all in 2011: on September 19, (Tr. at 309); September 29, (Tr. at 298); and October 4, (Tr. at 296.) There might have been a prior visit–Dr. Metro's laboratory submission suggests there was, (Tr. at 310-18)–but there is no concrete evidence. Finally, Plaintiff appears to miscalculate the number of consultations with Dr. Craig. At one point, she lists five visits from May until August of 2010. (Doc. 10 at 6.) Later in the same brief, she counts ten visits with Dr. Craig from May through September of 2010, and boasts that she "saw Dr. Craig on an average of two times each month" during this period. (*Id.* at 9.) The first figure is accurate. The latter inflates the number by adding the dates on which Dr. Craig filled a disability form or wrote a letter for Plaintiff.

20 C.F.R. § 404.1567(a). The additional limiting conditions the ALJ placed on this description included that Plaintiff

> could never crawl or climb ladders, ropes, or scaffolds; but could occasionally climb ramps or stairs, balance, stoop, crouch, and kneel. [She] could only occasionally overhead reach and handle. She could have no constant fingering or feeling. The claimant would need to avoid concentrated exposure to excessive vibration and concentrated use of moving machinery and avoid all exposure to unprotected heights. [Her] work would be limited to simple, routine, and repetitive tasks; performed in a work environment free of fast paced production requirements; involving only simple, work-related decisions; and with few, if any, work place changes. [She] could have only occasional interaction with the public.

(Tr. at 17.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff's two arguments are slight variations of the same contention: substantial evidence does not support the ALJ's decision.[6] (Doc. 8 at 9-19.) Plaintiff's first argument requests reversal

---

[6] Plaintiff's Motion and Brief each include a single sentence asserting that the ALJ erred in finding Plaintiff failed to satisfy Social Security Listing 14.06, 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.06. (Doc. 8 at 2, 9.) Neither the Brief nor Plaintiff's Reply Brief, (Doc. 10), develop the argument. Plaintiff apparently elaborated this claim in a brief to the Social Security Appeals Council, (Tr. at 195-96), but not in her pre-hearing brief to the ALJ, (Tr. at 189-92), or at the hearing. More importantly for present purposes, the Plaintiff's failure to make any argument on this matter in her initial brief to this Court waives the claim. *See Swain v. Comm'r of Soc. Sec.*,

for the ALJ's refusal to heed the opinions of Plaintiff's physicians. (*Id.* at 9-12.) The ALJ also committed legal error by not granting certain medical opinions controlling weight or giving "good reasons" for reducing their weight. (*Id.* at 13-17.) The second and final argument appears to rely on Plaintiff's intuition that substantially gainful activities could not possibly exist that conform to the ALJ's residual functional capacity determination ("RFC"). (*Id.* at 17-19.)

### a.   Treating Sources

### I.   Standards

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

---

379 F. App'x 512, 517-18 (6th Cir. 2010) (upholding determination that plaintiff's failure to argue a claim in its merits brief before the district court waived that claim). *See also Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived."); *Aarti Hospitality, L.L.C. v. City of Grove City, Ohio*, 350 F. App'x 1, 11 ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . . Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner). In any case, Plaintiff does not meet the much higher level of proof required to fit into a listing. *See* 20 C.F.R. pt. 404, subpt. P, App. 1 (stating that listing impairments and other equal impairments must be severe enough to preclude any gainful activity). *See also Zebley*, 493 U.S. at 525 (same).

Sources often give evidence in the form of medical opinions. "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2. The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from non-treating acceptable sources, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*,, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with

respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

However, a treating source opinion loses its controlling effect under certain circumstances. First, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh.'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). At that point, the reviewing court should not subject the opinion to "greater scrutiny" than the non-treating sources, *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013), but rather treat it as any other medical opinion. 20 C.F.R. § 404.1527(c). Thus, the ALJ must employ the last five elements of the six-factor test described above to establish the weight the opinion deserves. *Id.* § 404.1527(c)(2). For example, sources can also lose treating status if their opinions are internally inconsistent, contradicted by other evidence, cover an area the sources did not test, or lack supporting evidence. *See Robinson v. Barnhart*, 124 F. App'x 405, 412-13 (6th Cir. 2005) (holding that a treating opinion was not controlling because substantial evidence in the record contradicted it); *Love v. Comm'r of Soc. Sec.*, 605 F. Supp.2d 893, 897-98 (W.D. Mich. 2009) (noting that opinion was internally inconsistent and was not supported by objective evidence).

Additionally, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion [including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals

a Listing, the individual's residual functional capacity,[7] and the application of vocational factors. *Id.* § 404.1527(d)(3). Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The ALJ must use the balancing test under 20 C.F.R. § 404.1527(c) to analyze those medical opinions not accorded controlling weight, and failure to do so can "constitute[] error" requiring remand. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)). But the "treating-source rule is not 'a procrustean bed, requiring an arbitrary conformity at all times.'" *Francis*, 414 F. App'x at 805 (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). An error is harmless if, "'(1) a

---

[7] The Commissioner's power to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (noting that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527[c](2) . . . even though she has not complied with the terms of the regulation.'" *Cole*, 661 F.3d at 940 (quoting *Friend*, 375 F. App'x at 551).

The regulations mandate that the ALJ provide "good reasons" for the weight he assigns the treating source's opinion in his written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. *See also Rogers*, 486 F.3d at 242. "This  requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Determining whether a physician is a treating source is a fact-intensive inquiry. "Acceptable medical sources" qualify as treating sources only if they are "licensed physicians" or "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)-(2). *See also* SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). Additionally, to become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. § 404.1502. That is, treatments

26

or evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *See, e.g.*, *Smith*, 482 F.3d at 876 (finding that two physicians who each treated claimant once were not treating sources).

In the Sixth Circuit, "more than one examination is required to attain treating-physician status." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989) (same). Moreover, "depending on the circumstances and the nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506-07. *See also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source . . . ."). Finally, a physician the claimant consults only to obtain a report for her disability claim is not a treating source. 20 C.F.R. § 404.1502.

### ii.    Treating Sources, Credibility, and Fibromyalgia

The intersection of treating source law and fibromyalgia claims presents particular difficulties for the ALJ and the reviewing court. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that fibromyalgia was "a common, but elusive and mysterious, disease . . . [i]ts cause or causes are unknown, [and] there is no cure"). What makes the problem so intractable is the dearth of objective techniques that can demonstrate fibromyalgia's presence or its severity. *Id.*

(noting "its symptoms are entirely subjective"). This puts significant pressure on the procedure for evaluating subjective symptoms, which usually must be based on objective evidence to meet the regulations' standards. SSR 96-7p, 1996 WL 374186, at *1. Generally, "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical . . . impairment." *Id.*

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they

lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis.[8] As noted, resort to objective evidence of severity is often unavailing. *Rogers*, 486 F.3d at 243. The Sixth Circuit has issued strong opinions on this point, in one case reversing a district court's decision to affirm the ALJ's denial because of the ALJ's undue emphasis on the lack of objective evidence. *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) ("[T]he ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of

_____

[8] The Social Security Administration issued a new Ruling on fibromyalgia after the ALJ decided this case. SSR 12-2p, 2012 WL 3104869. While retroactivity analysis does not apply to such rulings, *Gaffney v. Comm'r of Soc. Sec.*, No. 00-10336-BC, 2004 WL 192287, at *1 (E.D. Mich. Jan. 26, 2004), the Ruling did not bind the ALJ or this court and will not be considered in this review. *Hudson v. Comm'r of Soc. Sec.*, No. 12-13272, 2013 WL 4487452, at *9 (E.D. Mich. Aug. 19, 2013) (adopting Report and Recommendation). In any case, the Ruling's only novel contributions deal with determining if the claimant has fibromyalgia, which is not at issue here. The severity and limitations analyses remain the same under the new ruling. SSR 12-2p, 2012 WL 3104869, at *5.

fibromyalgia."). The court awarded benefits rather than remand the case. *Id. See also Rogers*, 486 F.3d at 243-48 ("[T]he nature of fibromyalgia itself renders . . . over-emphasis upon objective findings inappropriate."); *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818, 820 (6th Cir. 1988) (noting that evidence such as normal strength and x-ray scans "are not highly relevant in diagnosing fibrositis or its severity"); *Halbrook v. Astrue*, No. 2:07-cv-150, 2010 WL 623676, at *11 (W.D. Mich. Feb. 18, 2010) ("In cases involving fibromyalgia, analysis of a claimant's subjective complaints of pain become critical for determining whether a disability exists."); *Canfield v. Comm'r of Soc. Sec.*, No. CIV.A.01-CV-73472-DT, 2002 WL 31235758, at *1 (E.D. Mich. Sept. 13, 2002) ("It is . . . nonsensical to discount a fibromyalgia patient's subjective complaints on the grounds that objective medical findings are lacking."); *Runyon v. Apfel*, 100 F. Supp. 2d 447, 450 (E.D. Mich. 1999) ("With fibromyalgia claimants, the disability determination is more necessarily complicated because normal clinical results do *not* necessarily suggest the absence of a disability.").

Consequently, test results showing normal strength, gait, or range of motion are not convincing evidence of the claimant's health. *See Rogers*, 486 F.3d at 248 (noting that normal reflexes and sensory testing are not persuasive). As the Sixth Circuit noted in one of its first cases on this topic, "fibrositis [i.e., fibromyalgia] patients manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston*, 854 F.2d at 820. *See also Schedule for Rating Disabilities; Fibromyalgia*, 64 Fed. Reg. 32,410, 32,411 (June 17, 1999) (codified at 38 C.F.R. pt. 4) ("[O]bjective impairment of musculoskeletal function, including limitation of motion of the joints, is not present" in fibromyalgia.). Normal x-ray results, neurological reactions, and the absence of joint inflamation also do not show the claimant lacks a

disability. *See Swain*, 297 F. Supp. 2d at 993. One court concluded that these factors are thus "improper . . . according to Sixth Circuit law in cases of fibromyalgia." *Johnson v. Comm'r of Soc. Sec.*, No. 1:12-cv-590, 2014 WL 1512497, at *7 (S.D. Ohio Apr. 16, 2014). In contrast, evidence that the source conducted a cursory examination can be cited as a lack of objective evidence. *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 624-25 (6th Cir. 2010).

Courts find similar difficulties in attempting to tether their credibility analyses to the elements in SSR 96-7p, such as daily activities, treatments, and medications. 1996 WL 374186, at *3. These factors appear to have diminished significance in many fibromyalgia cases. Opinions frequently note that the ability to complete quotidian activities like personal care and driving does not signify the claimant is capable of a full day's work. *See Rogers*, 486 F.3d at 248 ("Yet these somewhat minimal daily functions are not comparable to typical work activities."); *Halbrook*, 2010 WL 623676, at *15 (remanding case, in part, because "the ALJ failed to address the evidence regarding the amount of time taken to complete . . . basic activities or how fatigued Plaintiff is after completing those activities"); *Payne v. Astrue*, No. 3:07CV403-J, 2008 WL 4372016, at *1 (W.D. Ky. Sept. 23, 2008) ("[T]he Court notes that where, as in this case, impairments [like fibromyalgia] impose *intermittent* limitations, the credibility of the plaintiff cannot be rejected simply because she 'occasionally' engages in certain activities of daily life."). "It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment." *Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008). The reticence to focus on daily activities has at least a tenuous connection to the regulations, which note that the Commissioner "do[es] not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs

31

to be substantial gainful activity." 20 C.F.R. § 404.1572(c). *See also Gilbert v. Comm'r of Soc. Sec.*, No. 09-13529, 2012 WL 1890884, at *5 (E.D. Mich. May 23, 2012) (citing this regulation to cast doubt on the ALJ's credibility findings). Of course, the regulations also require the ALJ to consider daily activities, so ignoring them would constitute error. 20 C.F.R. § 404.1529(c)(3)(I).

Fibromyalgia also reduces the usefulness of the treatment prong in the credibility analysis. Conservative treatment plans and modest medication lists generally indicate the claimant is not disabled. *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) (noting that a "modest treatment regimen . . . is inconsistent with a diagnosis of total disability"). However, limited plans are often the only option with fibromyalgia and courts are accordingly hesitant to use them as evidence of an ability to work. Consequently, various combinations of prescriptions, potential surgeries, and exercise regimens show the plan is sufficiently aggressive to corroborate the claimant's complaints of disabling pain. *See Kalmbach*, 409 F. App'x at 864 (noting that "more 'aggressive' treatment is not recommended for fibromyalgia patients"); *Rogers*, 486 F.3d at 247 (noting "testimony by Dr. Leeb that the best treatment for fibromyalgia patients is to exercise regularly"); *Preston*, 854 F.2d at 820 (noting that the physician "has done all that can be medically done to diagnose [claimant's] fibrositis and to support his opinion of disability" because he "referred [claimant] to a neurologist, orthopaedist, rheumatologist, and a psychologist" and recommended "physical therapy and a pain clinic for treatment"); *Davies v. Colvin*, No. 3:12cv00355, 2013 WL 5947225, at *10 (S.D. Ohio Nov. 6, 2013) (finding that claimant's failure to see a fibromyalgia specialist did not provide evidence that claimant's "pain levels were less than she described").

The diminished potency of traditional evidence has heightened the importance of treating sources in fibromyalgia cases. *Rogers*, 486 F.3d at 245 (questioning the ALJ's reliance on two non-treating sources, which the court stated was "a fact of special significance given the unique nature of fibromyalgia"); *Mattingly v. Astrue*, No. 3:07CV327-J, 2008 WL 2437544, at *2 (W.D. Ky. June 13, 2008) ("[P]laintiff . . . asks that the Commissioner respect the need for heightened attention to treating physicians' opinions in cases of fibromyalgia. The Court agrees, and concludes that remand is in order for application of the principles set out in *Rogers*."); *Barker-Bair*, 2008 WL 926569, at *7 ("Accordingly, since the presence and severity of fibromyalgia cannot be confirmed by diagnostic testing, the treating physician's opinion must necessarily depend upon an assessment of the patient's subjective complaints."); *Payne*, 2008 WL 4372016, at *1 (noting the "elevated importance of treating physician opinion in cases of fibromyalgia"); *Swain*, 297 F. Supp. 2d at 991 ("As fibromyalgia has become better understood, courts have come to recognize that the traditional formula used in this case [for weighing treating source opinions] is ill suited to testing treating physicians [sic] opinions about the limitations caused by that disease.").

"Thus, the physician's clinical notes and observations will be critical in assessment [sic] the level of impairment caused by fibromyalgia." *Byberg v. Comm'r of Soc. Sec.*, No. 12-10158, 2013 WL 1278397, at *9 (E.D. Mich. Mar. 11, 2013) , *adopted by* 2013 WL 1278500 (E.D. Mich. Mar. 27, 2013). But treating source opinions are not always deferred to in fibromyalgia cases. *See Adeyemi v. Comm'r of Soc. Sec.*, No. 1:11 CV 423, 2011 WL 6181445, at *7 (N.D. Ohio Dec. 13, 2011). "Courts have interpreted [Sixth Circuit precedent] as not establishing special rules for treating source opinions with respect to fibromyalgia." *Id.* (Citing *Cooper v. Astrue*, No. 1:10CV-

00012-J, 2010 WL 5557448, at *4 (W.D. Ky. Oct. 15, 2010), *adopted*, 2011 WL 53195 (W.D. Ky. Jan. 07, 2011)).

These cases raise hurdles to successfully refuting fibromyalgia claims backed by treating sources. However, multiple factors serve to cabin these claims. First, there is a significant distinction between failing to find a severe impairment at step two, and failing to find disability at step five. The Sixth Circuit's forceful opinion in *Rogers* sprang, in part, from the ALJ's "hesitancy in identifying [fibromyalgia] as a severe impairment." 486 F.3d at 243. While this distinction is not determinative, it helps explain the case results. *See Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012) (noting the "important distinction between, on one hand, diagnosing fibromyalgia and finding it to be a severe impairment and, on the other, assessing a claimant's physical limitations due to the impairment"); *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) ("Nonetheless, a *diagnosis* of fibromyalgia does not automatically entitle [the claimant] to disability benefits . . . ."); *Sarchet*, 78 F.3d at 307 ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority."). The claimant still must prove the limitations associated with her fibromyalgia. *See also Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967) ("The fact that a person is suffering from a diagnosed disease or ailment is not sufficient in the absence of proof of its disabling severity to warrant the award of benefits."); *Hudson*, 2013 WL 4487452, at *10 (distinguishing the case from *Rogers* in part because the ALJ found a severe impairment); *Bush v. Astrue*, No. 2:07-CV-257, 2009 WL 311121, at *15 (E.D. Tenn. Feb. 6, 2009) ("Contrary to Plaintiff's position, it is the functional limitations imposed by a condition, not just a diagnosis of the condition, that determines disability.").

34

Courts also continue to defer to an ALJ's credibility assessment and sometimes even accentuate its importance. The Sixth Circuit stated in a fibromyalgia case that "[b]ecause credibility is particularly relevant in the absence of sufficient objective medical evidence, the courts will generally defer to the Commissioner's assessment of credibility when it is supported by an adequate basis." *Blair v. Comm'r of Soc. Sec.*, 430 F. App'x 426, 430 (6th Cir. 2011). *See also Sumner v. Comm'r of Soc. Sec.*, No. 1:12-CV-27, 2014 WL 1341085, at *2-3 (W.D. Mich. Mar. 31, 2014) (giving deference to the ALJ's finding that the claimant was not entirely credible because she engaged in activities similar to the claimant's in *Rogers*); *Hudson*, 2013 WL 4487452, at *11-12 (giving the ALJ's credibility determination substantial deference, and declining to reverse even though ALJ may have erred); *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958, 960-61 (N.D. Ohio 2003) (noting that the absence of objective evidence on severity "places a premium . . . on the assessment of the claimant's credibility," but finding that the ALJ failed to articulate his analysis). *See also Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (noting that an ALJ's credibility assessment can be disturbed only for a compelling reason (citing *Halter*, 307 F.3d at 379)). Yet, that deference unaccountably diminishes in other cases that emphasize the dissimilitude of a claimant's ability to do daily activities from her ability to do full-time work. *See, e.g.*, *Baker-Bair*, 2008 WL 926569, at *11 (discounting the ALJ's credibility analysis, in large part because the court believed that personal care, shopping, gardening, and working on the computer were not equivalent to full-time employment).

The division in the cases is best explained by consistent factual differences. In particular, because treating opinions hold substantial weight, the uniformity of those opinions and their consistency with other medical opinions is significant. *Compare Kalmbach*, 409 F. App'x 852

(finding it important that both the treating specialist and the treating physician described limitations that precluded the claimant from work), *Rogers*, 486 F.3d 234 (noting that both treating physicians diagnosed claimant with fibromyalgia and gave limitations that, if accepted as controlling, would result in a finding of disability), *and Swain*, 297 F. Supp. 2d 986 (noting that the lone treating physician opined that the claimant was unable to work), *with Torres*, 490 F. App'x 748 (finding the diminished weight given to treating opinion was proper, in part because the majority of all opinions were reflected in the ALJ's RFC), *and Blair*, 430 F. App'x 426 (upholding ALJ's rejection of the treating source opinion, in part because other medical opinions contradicted it).

Inconsistencies with other evidence, particularly the claimant's activities and testimony, reduce the treating source's persuasiveness. *See McDowell v. Astrue*, No. 11-64-JBC, 2012 WL 2178990, at *2-3 (E.D. Ky. June 12, 2012) (noting that the treating source's opinion on limitations was contradicted by the claimant's testimony); *Tyrpak v. Astrue*, 858 F. Supp. 2d 872, 881-83 (N.D. Ohio 2012) (finding that the ALJ gave good reasons for providing less weight to treating opinion and specialist opinion where they lacked sufficient explanation and claimant's activities contradicted them).

Also, ALJ decisions generally display adequate consideration of the sources when they give weight to the treating source opinions in the RFC, even if they do not accept the opinions completely. *See Torres*, 490 F. App'x at 753 ("The vast majority of the opinions expressed by both treating and examining sources is consistent with the RFC determination."); *Wines*, 268 F. Supp. 2d at 959 ("At the outset, it should be noted that the ALJ did give substantial weight to the assessments of these treating physicians."). Finally, the discredited factors above, such as conservative treatments, still have some affect on the decisions. *See Byberg*, 2013 WL 1278397,

at *9 (noting that "the ALJ gave no weight to plaintiff's treating physician's for several valid reasons," including a conservative treatment plan).

Despite the variability in decisions resulting from the largely factual inquiry necessary in fibromyalgia claims, the guiding principles from the case law are discernable. Courts should be wary of an ALJ's rationale for denial that relies on the lack of objective evidence, a claimant's ability to complete personal tasks, and a conservative treatment approach. Instead the analysis must be sensitive to the subjective nature of fibromyalgia and give due deference to treating sources. This does not mean, however, that the traditional factors are summarily disregarded. Finally, the ALJ's explanation of internal contradictions or questionable evidence in treating source opinions still provides a sufficient basis to uphold the finding.

### iii.    Analysis

The instant case presents a close question. On one hand, the ALJ cast doubt on opinions from physicians who arguably deserve treating-source deference. A few of his rationales were not "good" under the regulations; they instead represented factors with limited value in fibromyalgia cases. On the other, he recognized indisputable deficiencies in those opinions and incorporated much of their analyses nonetheless. In light of the deference owed the ALJ, particularly on credibility findings, I recommend upholding his findings.

The ALJ employed the elements from 20 C.F.R. §§ 404.1527(c), 404.1529(c)(3) to weigh the medical opinions and Plaintiff's credibility. (Tr. at 15-23.) He would be faulted if he failed to use them. And to the extent they had any relevance, he correctly noted they worked against Plaintiff's case. Moreover, they were properly considered for Plaintiff's non-fibromyalgia impairments and the Record supports the ALJ's conclusions on these matters. The ALJ gave the

opinions adequate weight under 20 C.F.R. § 404.1527(c). Any slight differences between the opinions and the ALJ's use of them are more than justified based on issues with the length of treatment, lack of objective testing, and the consistency of the mild diagnoses and restrained treatment plans.

The ALJ's analysis under 20 C.F.R. § 404.1529(c)(3) also suffices for the non-fibromyalgia claims. Many of the opinions on these impairments lacked supporting evidence, recommended conservative treatments that were somewhat successful, and were contradicted by Plaintiff's daily activities. The degenerative disc disease was mild, according to the scant objective records. Dr. Doshi noticed spasming and tenderness, but found Plaintiff had only a "somewhat limited" range of motion. (Tr. at 225.) Dr. Reina also observed that she had a full range of back motion and normal strength. (Tr. at 257-58.)

The other opinions overwhelming agreed that her back movements, strength, and gait were normal. (Tr. at 219-20, 225, 275, 320-21.) Multiple MRIs showed only mild problems, (Tr. at 219-20, 273, 276), and chiropractic treatment helped, (Tr. at 245-47). Her anxiety and depressive disorders did not prevent social engagements, (Tr. at 247-48), were contained with medication, (Tr. at 251), did not significantly affect her concentration or comprehension skills, (*Id.*), and were not treated with therapy, (*Id.*). Her obesity is well-documented, (Tr. at 247-48), but the Record does not reveal it impairs her beyond the RFC's limitations. Finally, as discussed in the next section, Plaintiff's carpal tunnel syndrome diagnosis was built on little more than subjective complaints.

If the ALJ erred in evaluating the medical opinions or Plaintiff's credibility, it was in placing too much emphasis on certain factors to question the severity of Plaintiff's fibromyalgia. Yet, unlike many of the cases reversing or remanding, the ALJ here accepted fibromyalgia as a

severe impairment and used it to justify drastic restrictions in his RFC. *Compare Kalmbach*, 409 F. App'x 852 (no severe impairment), *and Rogers*, 486 F.3d 234 (same), *with Torres*, 490 F. App'x 748 (distinguishing severe impairment and disability determinations); *Vance*, 260 F. App'x 801(same). His substantial incorporation of the medical opinions indicates that he gave them sufficient deference. *See Torres*, 490 F. App'x at 753 (noting that the ALJ adopted most of the source opinion limitations).

He misinterprets the nature of fibromyalgia, however, by focusing on the paucity of the supporting objective evidence. (Tr. at 19-21.) Again, he was required to consider the quantity and nature of this evidence, and the Record would not allow him to claim there was objective support. His repeated references to this factor nonetheless suggest an undue preoccupation. Fibromyalgia examinations look at the following: the patient's history of widespread pain; eighteen bilateral points for tenderness or the manifestation of six fibromyalgia signs, such as fatigue, cognitive issues, irritable bowel syndrome, depression, anxiety, and sleeplessness; and evidence excluding other conditions. SSR 12-2p, 2012 WL 3104869, at *3. The sources here followed this course: Plaintiff manifested each of the co-morbidities, (Tr. at 238, 270); examinations and laboratory results ruled out other conditions, (Tr. at 242-44, 310-18); Plaintiff was tender at most of the necessary sites, (Tr. at 302); and Plaintiff attested to a long ordeal of widespread pain, (Tr. at 218, 223). These few available measures confirmed Plaintiff's fibromyalgia. The tests only go so far, however, and the recent ruling recommends them simply to establish the existence of the condition, not its severity. SSR 12-2p, 2012 WL 3104869, at *2-4, 5. Thus, the lack of empirical proof neither disproves nor proves disability.

The ALJ's analysis also relied too heavily on Plaintiff's conservative treatments. (Tr. at 18, 19, 21.) As the cases show, this observation does little to chip away at Plaintiff's fibromyalgia diagnosis. Her physicians recommended physical therapy and exercise, (Tr. at 220, 299-309), provided injections and medications, (Tr. at 227, 296, 298 ), and referred her to specialists when necessary, (Tr. at 224). Surgery was ruled out due to her obesity, not because she lacked the need for thorough treatment. (Tr. at 276.) Even then, Dr. Sidhu considered a procedure to help her back. (Tr. at 273, 278.) Like the doctors in *Preston*, Plaintiff's physicians did "all that [could] be medically done to diagnose [the Claimant's] fibrositis and to support [their] opinion of disability." 854 F.2d at 820. Nonetheless, courts still must consider the level of treatment in fibromyalgia claims, *Byberg*, 2013 WL 1278397, at *9, and the ALJ's use of it here was not improper, even if it was unpersuasive.

The ALJ's analysis was also slightly off-the-mark in finding that Plaintiff's daily activities discredited her complaints of pain. (Tr. at 22.) Ability to participate in normal activities implicates credibility, but courts in this context are quick to note the difference between such actions and full-time work. *See Rogers*, 486 F.3d at 248. Why this disparity takes increased prominence in fibromyalgia cases is unexplained; the inherent subjectivity of fibromyalgia offers one possibility. In any case, the principle applies here to weaken the ALJ's argument. Plaintiff's intermittent cooking, housework, walks, stretching, shopping, driving, socializing, recreating, and napping do not equal forty-hours of weekly labor. (Tr. at 22.)

But her daily life is not altogether irrelevant. The actions show that she can periodically stand and walk, use her hands to work on the computer and push remote control buttons, and successfully interact with others. She denies the capability to do these things in a workplace. Her

ability to do them at home, even though under significantly reduced pressure and in much less quantity, provides at least a basis for determining her basic functioning. Moreover, Plaintiff wants to have a child, (Tr. at 307); perhaps not at the moment, but soon enough to make talking to her doctors about fertility issues worthwhile. She told Dr. Metro that she had a miscarriage three years prior to their meeting. (Tr. at 307.) Prospective motherhood, of course, requires no work and does not contradict her complaints. Her comments do suggest, however, that she feels capable of assuming considerable physical and emotional responsibility: caring for young children is evidence a claimant is not disabled. *Temples v. Astrue*, No. 1:11CV-00090-JHM, 2012 WL 590814, at *5-7 (W.D. Ky. Jan. 24, 2012). *See also Andersen v. Astrue*, No. 3:11-cv-250-JAG, 2012 WL 4498921, *7, 14-16 (E.D. Va. June 15, 2012).

Despite these problems with the analysis, the ALJ properly weighed the source opinions. The crux of Plaintiff's case is that the ALJ impermissibly disregarded treating source opinions. Plaintiff spends much of her Brief and Reply Brief bolstering the treating status of Drs. Craig and Metro and attacking contrary opinions. (Doc. 8 at 7-17; Doc. 10 at 5-19.) Whether they were treating sources or not, I suggest that the ALJ gave "good reasons" for the substantial weight he accorded them. 20 C.F.R. § 404.1527(c)(2).

The first mark against the sources comes from the questionable progressions of their diagnoses: Dr. Metro quickly decided Plaintiff was totally disabled, while Dr. Craig's diagnosis jumped inexplicably from temporary to permanent disability. Plaintiff's Brief hardly refers to Dr. Metro without noting that she was Plaintiff's "long time [sic] fibromyalgia specialist." (Doc. 8 at 8, 11, 15.) Yet, the treatment relationship was anything but lengthy when Dr. Metro diagnosed fibromyalgia and was scarcely longer when Dr. Metro filled out a preprinted form declaring

Plaintiff totally disabled. (Tr. at 286-309.) The relationship, as evidenced in the Record, was crammed into three sessions over roughly three weeks. (*Id.*) Length and frequency are only two factors to consider, but the sliver of treatment time here does not indicate an ongoing relationship. 20 C.F.R. § 404.1527(c). Plaintiff announced in her first meeting that she sought disability, (Tr. at 309), and the records end with Dr. Metro's form opinion, (Tr. at 286-90), helping her with that goal.

Dr. Metro's opinion also conflicts with her own notes and other evidence. As the ALJ pointed out, the form states Plaintiff needs a cane or assistive device, (Tr. at 21, 288), and elsewhere listed Plaintiff's complaints of dizziness, (Tr. at 299), and Plaintiff's report that she fell twice, (Tr. at 306). But the notes do not contain firsthand observations of her gait and in fact frequently recommended that Plaintiff walk for one-half hour for exercise. (Tr. at 295, 301, 308.) Other sources consistently reported that she had a normal gait. (Tr. at 245, 255.) Dr. Metro's notes do not readily translate into the specific limitations listed in the form. Moreover, the notes only record one actual physical examination. (Tr. at 302.)

The progression of Dr. Craig's diagnosis also raises skepticism. Plaintiff saw Dr. Craig four times over a five month period. The frequency of visits suggests an ongoing relationship, but the total length of treatment does not. More importantly, Dr. Craig declared her totally disabled only once and, as with Dr. Metro, the treatment appears to have stopped after Plaintiff received this in writing. (Tr. at 259.) Prior to jotting down this brief opinion in an unaddressed letter, Dr. Craig consistently opined that she could return to work within one or two months. (Tr. at 261-71.) Dr. Craig then makes a jarring and unexplained jump: at the end of August, he reported Plaintiff would be able to work at the start of October. (Tr. at 261.) A few weeks later, with no intervening examinations or appointments, Dr. Craig extended his estimate to indefinite disability. (Tr. at 259.)

42

However, the opinion is ambiguous. Giving Plaintiff the benefit of the doubt, it appears that Dr. Craig opines permanent disability in the letter. Yet, nothing in it contradicts his previous disability end date in October. Finally, Dr. Craig's opinions were written on either preprinted forms for Ford's disability program–with no functional limitations mentioned–or unaddressed letters. (Tr. at 259-71.)

The ALJ also pointed out the Record's inconsistencies. (Tr. at 18-22.) While a few non-medical sources concurred with Dr. Craig's and Dr. Metro's opinions, it was by no means universal support. Mr. Fuller's opinion, based only on subjective complaints and prior medical reports, agreed with Dr. Craig. (Tr. at 281-84.) Additionally, Plaintiff's counsel wrote to the ALJ that this opinion was "obtained for another legal matter," rather than for treatment or genuine medical diagnosis. (Tr. at 191.) The single, unaddressed note from her chiropractor also said she was disabled. (Tr. at 323.) Neither of these sources can offer medical opinions, SSR 06-3p, 2006 WL 2329939, at *2, and in any case neither supported their opinion with evidence of independent examinations or other objective evidence.

The rest of the sources, in contrast, support the ALJ's findings. Dr. Turner's lone letter written for a different legal matter suggests that Plaintiff is disabled, but expressed optimism about treatments and her ability to return to work. (Tr. at 285.) Dr. Reina's review for Plaintiff's employer found only temporary disability, implying that she could return to work within four weeks. (Tr. at 258.) Dr. Doshi declined to support her case for disability because it lacked "documented proof." (Tr. at 221.) Dr. Sidhu did not comment on her fibromyalgia and only offered "an off-work note" for one month because of her youth. (Tr. at 277.) Finally, Dr. Rousseau's mental examination concluded that Plaintiff "appears able to attend, comprehend, and follow basic instructions fairly

well, and she is likely able to perform a variety of activities and respond appropriately to changes in a work setting." (Tr. at 251.)

Finally, the ALJ incorporated the bulk of Dr. Metro's opinions into the RFC. (Tr. at 17-22.) Dr. Metro said Plaintiff could occasionally lift ten pounds, rarely lift twenty pounds, and would need to sit quietly or lie down fifty-percent of the time, and occasionally stand and walk. (Tr. at 287-88.) The ALJ's RFC allows her to lift no more than ten pounds and limits her walking and standing. (Tr at 17). The RFC places less significant restrictions on hand use than Dr. Metro recommends, but limits her other movements and her interaction with the public. (Tr. at 17.) In short, the ALJ used much of Dr. Metro's recommendation and substantial evidence supports his decision to exclude the rest.

### b.    The RFC and Substantial Gainful Employment

Plaintiff ends her Brief with two pages arguing, in essence, that the ALJ's hand restriction is irreconcilable with the nature of sedentary jobs. (Doc. 8 at 17-19.) In particular, Plaintiff points to a non-binding ruling that "most unskilled sedentary jobs require good use of the hands for repetitive hand-finger actions." SSR 83-10, 1983 WL 31251, at *5. The ruling does not define what constitutes "good use," and the line is absent from the regulation. 20 C.F.R. § 404.1567(a).

A more recent ruling, SSR 96-9p, 1996 WL 374185, at *8, not cited by Plaintiff, discusses manipulative limitations in unskilled sedentary jobs. The ruling clarifies that a "*significant manipulative limitation . . . [in] both hands*" would erode much of the job base. *Id.* For any less restrictive limitation, the Ruling recommends consulting a vocational resource. *Id.* at *8-9. For example, the ability to only occasionally use the left hand for a right-hand dominant claimant is not a significant limitation. *Barringer v. Colvin*, No. 1:13CV1061, 2014 WL 809784, at *9-12 (N.D.

Ohio Feb. 28, 2014). A "significant erosion" of the job base usually produces a finding of disability. SSR 96-9p, 1996 WL 374185, at *8. However, "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.'" *Id.* at *1.

Though Plaintiff cites no cases, or any other binding law, there is some support for the proposition that the ALJ should reconcile a "no constant fingering or feeling" restriction with a sedentary job limitation. *See Shepard v. Colvin*, No. 12-cv-14386, 2013 WL 6062006, at *5 (E.D. Mich. Nov. 18, 2013). However, in that case the court noted that "[w]hile such a reconciliation may be possible, it is certainly not intuitive and it was not articulated by the ALJ in his decision." *Id.* The Commissioner there conceded the restriction on hand use. *Id.*

The majority of courts, however, appear to find that an ALJ may rely on a VE's testimony if the hypothetical included the relevant limitations. *See Barrninger*, 2014 WL 809784, at *12 (noting that the ALJ is entitled to rely on the VE's opinion where the hypothetical included hand restrictions); *Graves v. Colvin*, No. 3:12-cv-01242, 2013 WL 4508645, at *20-23 (M.D. Tenn. Aug. 23, 2013) (same); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009) (adopting Report and Recommendation) (same); *Farmer v. Astrue*, No. 3:07-cv-175, 2008 WL 343254, at *5-6 (S.D. Ohio Feb. 5, 2008) (same); *Higginbotham v. Astrue*, No. 06-282-JBC, 2007 WL 4365419, at *3 (E.D. Ky. Dec. 12, 2007) (same). *See also Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) ("[N]othing in applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy . . . .").

45

First, whatever the intuitive merits of Plaintiff's claim, the argument fails as a syllogism. Her major premise rests on SSR 83-10: most unskilled sedentary jobs need good hand skills for repetitive hand-finger actions. (Doc. 8 at 18.) The minor premise is that she has less than good use of her hands under the RFC because "any reasonable person would construe no over head [sic] reaching and handling and no constant fingering or feeling as less than good use of the hands for repetitive hand-finger actions." (*Id.*) Even assuming that "no constant fingering or feeling" constitutes less than good use of her hands, it does not follow that "she would be precluded from any unskilled, sedentary work." (*Id.*) The correct conclusion would be that she is precluded from "most" sedentary work.

The critical question, then, is whether the work available to her "exists in significant numbers in the national economy (either in the region where [the claimant] live[s] or in several regions in the country)." 20 C.F.R. § 404.1560(c)(1). Stated differently, the Commissioner must show at step five that there are significant numbers of unskilled sedentary jobs where either (1) "good use of the hands and fingers" under the ruling are not a requirement for employment, or (2) the RFC's restriction on hand movements is compatible with the position's need for "good use of the hands and fingers." In his brief to the Appeals Counsel, Plaintiff's attorney provided a fuller discussion of this point. (Tr. at 201-02.) Though that argument is not properly before the Court, I will address it because it shows the underlying problems of the present claim.

The brief questions the VE's estimate of available jobs. (Tr. at 201.) Relying on nothing more than intuition, Plaintiff stated, "[i]t seems to me that a document addresser, inspector and an assembler would all be jobs that require a production quota. Those jobs inherently require an individual to produce a certain amount of work product and they cannot be performed at the

46

employees [sic] preferred pace." (*Id.*) Why a production quota precludes Plaintiff from these tasks is not addressed. In any case, neither the ALJ nor the Appeals Council were required to replace the VE's conclusions with these vocational insights. Furthermore, Plaintiff's counsel had the opportunity at the hearing to inquire into the specific requirements of the jobs the VE listed. (Tr. at 51-53.) He asked whether finger movements were important to sedentary work, but failed to identify the conflicts he now asserts between the specific jobs and the hypothetical limitations. (Tr. at 52.) *See* SSR 96-9p, 1996 WL 374185, at *10 n.8 ("Whenever a VE is used, the individual [claimant] has the right to review and respond to the VE evidence prior to the issuance of a decision.") This alone could be fatal to his argument. *See Aho v. Comm'r of Soc. Sec.*, No. 10-40052-FDS, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011) (citing *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late.")).

The ALJ here appropriately relied on the VE's testimony because he included the "frequent fingering" limitation in his hypothetical. (Tr. at 49.) The VE gave three occupations totaling 2,000 jobs in southeast Michigan that meet the RFC limitations. (Tr. at 47-50.) Plaintiff does not contend this is an insignificant number. *See Hall v. Bowen*, 837 F.2d 272, 275-76 (6th Cir. 1988) (finding 1,350 jobs in the local economy was significant). Nonetheless, even an examination of the Record under *Shephard*'s reasoning shows the ALJ's decision was proper.

The ALJ adequately considered the manipulative restrictions and their impact on the RFC in his decision. (Tr. at 18, 22.) Evidence of Plaintiff's carpal tunnel syndrome came from medical records, (Tr. at 234 ), and Plaintiff's testimony, (Tr. at 37-38). Specifically, Plaintiff informed Dr. Craig that she had the diagnosis, but that her previous physicians never gave her splints and instead

wanted to inject cortisone. (Tr. at 234, 238.)[9] Dr. Craig did the opposite, giving her splints and waiting to see if she still needed injections. (*Id.*) He mentioned the syndrome in two unaddressed letters, (Tr. at 259, 260), but, notably, did not include it in her work disability forms. (Tr. at 261-72.) Dr. Reina noticed that her left hand had depressed sensation. (Tr. at 258.) She testified that she has numbness, drops objects, and her hands shake as a result of carpal tunnel. (Tr. at 38.) Plaintiff complained of numb hands to Mr. Fuller. (Tr. at 283.) Dr. Metro also noted the carpal tunnel syndrome, (Tr. at 286, 300, 309), and gave low estimates of Plaintiff's fine manipulation ability, (Tr. at 289). Her chiropractor drafted an unaddressed letter simply noting that he treated Plaintiff's carpal tunnel, (Tr. at 323.), though Plaintiff did not list this on her disability report as a treatment he provided her, (Tr. at 154). Finally, Plaintiff reported an arthritis diagnosis and resultant hand pain to Dr. Rousseau during a consultative mental status examination.[10] (Tr. at 246, 251.) The official diagnosis is not in the Record and no other evidence reports hand pain from carpal tunnel or arthritis. (Tr. at 218-28, 254-58, 273-80, 285, 319-23.)

Thus, the Record lacks any objective evidence that she has a condition in her hands or that she suffers from severe pain. To the extent she has a condition, the splints Dr. Craig provided represent a conservative treatment. Her daily activities provide abundant examples of her hand use: she operates the television, (Tr. at 41), and computer, (Tr. at 42); she generally cares for herself and her dogs, (Tr. at 34, 40-42); and she sometimes reads, (Tr. at 41), cooks, (Tr. 40-41), and drives,

---

[9] Mr. Fuller cites this record in his rehabilitation report and recites Dr. Craig's missing functional capacity report that concluded Plaintiff could not grip, reach, or do fine manipulation. (Tr. at 281-83.) Mr. Fuller's report merely repeats Dr. Craig's reports, one of which seems to come merely from Plaintiff's lone assertion and the other is not in the Record. The initial determination report also mentioned Dr. Craig's notation of carpal tunnel. (Tr. at 62.)

[10] Plaintiff listed arthritis on her disability report as well. (Tr. at 149.)

(Tr. at 40). These all involve fine manipulation with the fingers and active use of the hand. That she engages in these on a daily basis suggests that she has adequate use of her hands.

Because substantial evidence supports the ALJ's findings, and he considered Plaintiff's abilities in constructing his hypothetical and RFC, I accordingly recommend that this additional claim be denied.

### 3.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, falls within the "'zone of choice' within which decisionmakers may go either way without interference from the courts." *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.


Date:  June 17, 2014                    /S PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge


### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 17, 2014                    By   S/Alex Gallucci
                                        Law Clerk to Magistrate Judge Morris